**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 19 B 554 |
| FRANCISCA J. JUNG and BJ BYUNGJOON SUNG, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| | ) | |
| ———————————————————— | ) | |
| | ) | |
| CAFÉ HANAH, INC. and YUN SEOK BAEK, | ) | |
| | ) | Adv. No. 19 A 604 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge David D. Cleary |
| BJ BYUNGJOON SUNG, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter comes before the court on the complaint filed by Café Hanah, Inc. ("Café Hanah") and Yun Seok Baek ("Baek" and collectively, "Plaintiffs") against BJ Byungjoon Sung ("Sung" or "Defendant"). Plaintiffs seek a finding that any debt Sung owes to them is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The court held a trial at which Baek, Sung and an employee of the Village of Skokie testified. Having heard the testimony of the witnesses, reviewed the exhibits, and read the papers and briefs submitted by the parties, the court will enter judgment in favor of the Defendant.

**I.      JURISDICTION**

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409(a).

## II.    FINDINGS OF FACT

### A.  The parties enter into a contract for a restaurant buildout

Café Hanah is an Illinois corporation located at 4907 Oakton Street in Skokie, Illinois. Baek is the sole shareholder of Café Hanah, which was a restaurant business.  (Tr. at 11.)

Sung was the owner, manager and president of AMG Construction Group, LLC ("AMG").  (Answer at ¶ 8.)[1]  While the Illinois Secretary of State no longer shows AMG as active, AMG is still registered with the Missouri Secretary of State as an active limited liability company and lists Sung as its registered agent and sole organizer.  (Answer at ¶ 9.)

On or about November 7, 2012, Sung, on behalf of AMG, and Baek, on behalf of Café Hanah, executed an agreement whereby AMG would construct a restaurant for Plaintiffs in Skokie, Illinois. (Joint Pretrial Statement ("JPS"), Undisputed Fact 1; Plaintiff's ("Pl.") Ex. 1; Defendant's ("Def.") Ex. 1.)  Baek discussed and negotiated the contract with Sung, and with no one else.  (Tr. at 14-15.)

Sung was the person in charge of the project for AMG.  (Tr. at 79.)  He "was responsible for writing up a proposal and actually doing the general contracting, hiring all the subcontractors, and providing construction … management services" in order to build out the restaurant.  (Tr. at 80, line 25 – 81, line 3.)  Sung told Baek that construction would be finished by February 2013. (Tr. at 75-76.)

Shortly before the parties signed the contract, Sung learned about a TIF grant that was available for development in downtown Skokie (the "Village").  He informed Baek, they signed a contract for Sung to prepare the necessary documents, and Sung worked with a Village

---

[1] Defendant submitted the Answer as a proposed exhibit but did not seek to have it admitted into evidence. Nevertheless, "[t]he court can take judicial notice of its own docket and the dockets of other courts in related matters." *In re Prate*, 634 B.R. 72, 75 n.1 (Bankr. N.D. Ill. 2021).

employee.  A TIF grant was approved in October 2012, and Baek received $98,000.  (Tr. at 129-30.)

The total contract price for the buildout of Café Hanah was $167,700, with 30% due at signing, 60% due at rough-in inspection approval, and the remaining 10% to be paid at completion.  (Pl. Ex. 1.)  This price did not include extras, change orders and equipment. (JPS, Undisputed Fact 2.)  The contract obligated AMG to provide all construction needed to be able to open the restaurant.  (Tr. at 15.)

Plaintiffs paid $50,310 to AMG, or 30% of the contract price, on or about November 8, 2012.  (Tr. at 15; JPS, Undisputed Fact 4.)  Of that amount, Plaintiffs paid $5,000 prior to execution of the contract.  (Tr. at 64; Pl. Ex. 1.)  Plaintiffs do not claim that the $50,310 paid on or before November 8 was obtained by false pretenses or false representations. (JPS, Undisputed Fact 4.)

**B.  Construction commences and the Village inspects AMG's work**

Construction began immediately.  (Tr. at 16; 82.)  There was a pre-existing restaurant on site, so AMG had to tear "down the restaurant that was in there and, in effect, start[] from scratch to build a new one."  (Tr. at 82, lines 19-21.)  Sung was at the job site almost every day.  (Tr. at 81.)  He worked from architectural plans and coordinated communications between Baek and the architect as well as between the architect and the Village.  (Tr. at 116-17.)

Plaintiffs made the following additional payments to AMG toward the contract price:

| Date | Amount |
|---|---|
| 12/3/2012 | $10,000 |
| 12/20/2012 | $10,000 |
| 1/8/2013 | $10,000 |
| 2/18/2013 | $1,500 |
| 3/5/2013 | $10,000 |
| 3/8/2013 | $10,000 |
| 3/27/2013 | $5,000 |
| 3/29/2013 | $5,000 |

(JPS, Undisputed Fact 5; Def. Ex. 2.)  These payments totaling $61,500 are the payments that

Plaintiffs contend were obtained by false pretenses or false representations.  Sixty percent of the

contract price, which was due at the rough-in inspection approval, is $100,620.  (Tr. at 67, lines

14-17.)

### 1.  Plumbing inspections

The first stage of the construction on the Café Hanah project was demolition, which does

not require approval from the Village.  (Tr. at 83.)  After demolition was complete, AMG started

the next stage – underground plumbing – and called the Village for an underground plumbing

inspection.  (Tr. at 83.)  The Village inspector disapproved the underground plumbing on

December 3, 2012, and then approved it with exceptions two days later.  (Tr. at 86.)  According

to Sung, the underground plumbing inspection

> was approved with conditions. There was minor deficiencies, and it's very
> common practice for the inspector to let us move on if there's a small, minor
> deficiencies on the work.  But on -- the inspection form used by Village of Skokie
> did not have that line item, approval with conditions. Usually other cities have
> that.  So that's why they mark on the disapproved section. But they usually let
> you move on, and they will inspect those minor deficiencies on the next
> inspection.

(Tr. at 84, lines 5-14.)  Sung recalled that the inspector told him to "go ahead and move on.  I'll

inspect this at the final inspection."  (Tr. at 85, lines 13-14.)

The form used by the Village had options for "approved" and "disapproved" with an area

for comments.  (Tr. at 146.)  When asked at trial what a finding of disapproval means, Village

inspector Stephen Klocko responded, "Boy, that's a vague question."  (Tr. at 148 and 149, line

1.)

Baek and Sung had a conversation at the construction site on December 3, 2012, the date

of the first underground plumbing inspection.  Baek had an opportunity to look at the site that

day; he frequently visited the premises.  (Tr. at 68.)  Sung told Baek that the rough-in inspection was approved, with some deficiencies that did not prevent proceeding with the project, and that he should pay.  (Tr. at 16, 125.)  He shared the inspection report with Baek.  (Tr. at 124.)  Baek "believed in him 100%" and paid $10,000 that day.  (Tr. at 17, 126; Pl. Ex. 2.)

On December 20, 2012, Baek and Sung had another conversation at the construction site. Baek testified that Sung told him "that the rough inspection passed[.]" (Tr. at 18, lines 22-23.)  In fact, that day the Village inspector had disapproved the next inspection, which was for rough plumbing.  (Tr. at 86.)

According to Sung, the inspector's comment was "a minor deficiency, and that could have been inspected at final inspection.  So they let us move on." (Tr. at 86, line 24 – Tr. at 87, line 1.)  Sung testified that "[e]ven though it says disapproved, it was approved with the condition.…  I told him [Baek] it was approve[d] – I never said disapproved; I said approved with conditions." (Tr. at 87, lines 14-15 and 24-25.)  He shared the inspection reports with Baek, and informed him that construction could continue.  (Tr. at 124, 127.)

### 2.  The framing inspection

The next step in the rough-in inspection process was framing.  (Tr. at 88.)  On December 20, 2012, the Village inspector disapproved the rough framing inspection, providing five comments.  (Tr. at 89.)  Sung testified that after each inspection he told Baek "all these deficiencies.…  I told him approved with conditions." (Tr. at 90, lines 21-22; Tr. at 91, line 1.) "[W]e can move on with these little deficiencies because these can be inspected at the final inspection." (Tr. at 102, lines 6-8.)  "My definition of approval is so that we can move on to next step." (Tr. at 103, lines 3-4.)

Baek believed that AMG was entitled to 60% of the contract price, so he paid another $10,000 on December 20, 2012.  (Tr. at 19, 126; Pl. Ex. 2.)  Baek also believed that Sung was

taking care of relationships with the building inspectors for the Village.  (Tr. at 21.)  Sung wanted to keep good relationships with the various inspectors, (Tr. at 107), and was never told by any of the Village inspectors that he could not continue with the next step in the construction project (Tr. at 143).  It is common in the construction industry for work to continue even when deficiencies are found at the initial inspection.  (Tr. at 127.)

Village inspector Klocko testified that if a rough framing inspection was not approved, he might instruct the contractor that construction could still continue, depending upon the extent of the required corrections.  (Tr. at 146-47.)  "I would give permission to – say, drywall.  If there was an area that was completed, I would let them continue.  If there was an area that needed some work done, then I would not give approval for drywall in that area."  (Tr. at 147, lines 15-19.)

By March 12, 2013, a re-inspection of the framing yielded only one comment.  Sung "considered that as approved with a condition because he told me to go ahead and move on with the drywall."  (Tr. at 89, lines 19-21; Tr. at 92.)  With one exception, the deficiencies identified by the inspector could be completed with the drywall in place.  (Tr. at 129.)  Sung finished the drywall, excepting the one area that had been identified by the inspector, which was the infill around an arched window.  (Tr. at 135-36.)

AMG withdrew from the project before the Village approved the rough framing.  (Tr. at 92.)  Sung never called for the final piece of the rough-in inspection process, a rough mechanical inspection, because Baek "never gave me enough funds to do so."  (Tr. at 97, line 7.)  Sung "needed more funds to complete that work."  (Tr. at 96, lines 2-3.)

### 3.  Baek continues making payments

After making two payments of $10,000 each in December 2012, Baek made additional payments totaling $41,500 between January 8 and March 29, 2013.  (Tr. at 20; Pl. Ex. 2.)  He

made those payments because he believed, based on conversations with Sung, that the rough-in inspections had been approved.  (Tr. at 20.)

If Baek had known at the time he was paying AMG that the rough framing had not been approved, that the rough plumbing had not been approved, and that the rough mechanical had not been inspected, he would not have made those payments.  (Tr. at 61.)  "If disapproved, I would not make the payments." (Tr. at 62, lines 1-2.)

Baek did not pay the full 60% of the contract price that was due at the rough-in inspection approval.  "Because of the additional work" he had ordered, he wanted to stretch out the payments.  (Tr. at 69, line 6.)  Sung complained at trial that "there were a bunch of extras he [Baek] initiated, which I completed all the work.  And he still didn't have enough money for me to move on[.]" (Tr. at 96, lines 13-15.)  Plaintiffs also made payments in the amount of $29,800 to AMG in January and February 2013 for the purchase of parts and equipment and additional roofing work, items that were not included in the original contract price.  (Pl. Ex. 2.)  Plaintiffs do not claim that this amount was obtained by false pretenses or false representations.  (JPS, Undisputed Fact 6.)

Sung believed that Baek "was waiting for money to be wired from Korea[,]" so he accepted a series of partial payments over time.  (Tr. at 121, lines 10-11.)

## C.  Baek stops making payments and AMG stops working

### 1.  The parties' relationship deteriorates

Sometime at the end of March or beginning of April 2013, Baek received a phone call from a Village employee.  (Tr. at 21.)  Following that conversation, Baek and Sung had another discussion at the construction site.  Sung prepared a list of payments received, dated April 11, 2013.  (Def. Ex. 2.)  It showed a balance due on the contract in the amount of $63,659.60.  (*Id.*)

7

Sung asked for more funds, and Baek refused.  (Tr. at 25, 119.) He did not make any further payments to AMG or Sung.  (Tr. at 25.)

Around April 2013, AMG emailed an invoice to Plaintiffs for the sum of $12,000 to complete certain work on the premises.  (Def. Ex. 3; Tr. at 120-21.) Plaintiffs did not pay the invoice, (JPS, Undisputed Fact 7), but demanded that AMG return to work (Tr. at 137.)  Sung responded to that demand, indicating that AMG would return if Plaintiffs provided proof of funds.  (*Id.*)

AMG did not do any further work at the construction site.  (Tr. at 25-26.)  It withdrew as the general contractor, informing the Village on or about May 30, 2013, that it was withdrawing due to non-payment.  (Tr. at 122-23; Def. Ex. 4.)

Sung estimated at trial that AMG had completed 80% of the contracted work; all of the items on the contract "except the final finishes[.]"  (Tr. at 115, line 22.)  It had paid nearly $102,000 to various subcontractors, (Tr. at 123-24; Def. Ex. 5), so Sung told the subcontractors to "help Mr. Baek out if he's going to pay you guys direct." (Tr. at 138, lines 10-11.)

Shortly after leaving the Café Hanah project, AMG completed a gut rehab of a different building in the Village, completing the work in about a month.  (Tr. at 112.)

**2.  Baek takes over as general contractor of the Café Hanah project**

In or around May 2013, Baek took over as general contractor.  (Tr. at 26; 71.)  He had no experience in carpentry, electrical work, mechanical work or as a contractor.  (Tr. at 75.)  Baek rehired all of the subcontractors (except the carpenter) that AMG had used.  (Tr. at 76-77.)  The subcontractors finished the project.  (Tr. at 76.)

After Baek took over the role of general contractor, he had conversations and meetings with building inspectors employed by the Village.  (Tr. at 27; 49-50.)  During the time that he

was the general contractor, the Village approved the final plumbing inspection and the rough mechanical inspection.  (Tr. at 59-61.)

Café Hanah opened in or around August 2013, about three or four months after Baek took over as general contractor.  (Tr. at 72.)  It temporarily closed when Baek could not find enough employees, and then reopened a few years later.  (Tr. at 69-70.)  The restaurant closed permanently in or around September 2021.  (Tr. at 71.)

Baek and Café Hanah sued AMG and Sung in the Circuit Court of Cook County on April 28, 2016.  (Tr. at 74.)

### III.    CONCLUSIONS OF LAW

### A. Plaintiffs entered into a contract with AMG, not with Sung, and must pierce the corporate veil in order to impose personal liability

Baek and Café Hanah ask the court to find that their claim against Sung is nondischargeable.  Before the court can consider that request, however, it must address the threshold question of whether Sung is liable to Plaintiffs at all.  Plaintiffs signed a contract with AMG.  Plaintiffs have a claim against Sung only if they can pierce the corporate veil and hold Sung liable for AMG's debts.

Corporations and limited liability companies are separate and distinct legal entities from their shareholders and from each other.  "Piercing the corporate veil is not favored and in general, courts are reluctant to do so."  *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (citations omitted).

AMG is a Missouri limited liability company.  The law in Missouri provides that principals of corporate entities are held liable for corporate debts only in "narrow circumstances."

> In order to disregard the existence of a corporate entity, in an attempt to hold a
> business entity's owners or members liable for a business entity's debts, Missouri

9

law recognizes narrow circumstances wherein the corporate veil may be pierced.
Courts will pierce the corporate veil or disregard the business entity once a
plaintiff demonstrates a three-pronged test:

> (1) Control, not mere majority or complete stock control, but complete
> domination, not only of finances, but of policy and business practice in
> respect to the transaction attacked so that the corporate entity as to this
> transaction had at the time no separate mind, will or existence of its own;
> and

> (2) Such control must have been used by the defendant to commit fraud or
> wrong, to perpetrate the violation of a statutory or other positive legal
> duty, or dishonest and unjust act in contravention of plaintiff's legal rights;
> and

> (3) The aforesaid control and breach of duty must proximately cause the
> injury or unjust loss complained of.

Therefore, courts will look through corporate organizations and to individuals
when necessary to prevent injustice, but doing so is the exception rather than the
rule, and, ordinarily, a corporation will be regarded as a separate legal entity.

*Hibbs v. Berger*, 430 S.W.3d 296, 306–07 (Mo. Ct. App. 2014) (citations, quotations and

footnote omitted).

Plaintiffs argue that "when an LLC is controlled by a single member, both financially and

in business practices, and that member uses the control of the LLC to perpetuate a violation of a

legal duty or engages in dishonest or unjust acts in contravention of a plaintiff's rights, which

causes plaintiff to suffer damages, the controlling member is personally, not just vicariously,

liable for the damages suffered" and therefore, "due to the misrepresentations" the debt is the

liability of the Defendant and should be excepted from his discharge.  Plaintiffs' Posttrial Brief,

p. 6.

Plaintiffs adduced testimony that Defendant was AMG's sole member, and that he made

all of the financial and business decisions for the company.  During negotiations on the contract

between Café Hanah and AMG, Baek interacted only with Sung.  All of the discussions that took

place during the construction process were between Baek and Sung.  Plaintiffs have established

10

that Sung controlled AMG with respect to this transaction, such that AMG "had at the time no separate mind, will or existence of its own[.]" *Hibbs*, 430 S.W.3d at 306.

Plaintiffs then jump to the conclusion that Sung "used the LLC as a vehicle for his fraudulent conduct." Plaintiffs' Posttrial Brief, p. 6. But, other than the alleged misrepresentations, they do not explain how they reach the conclusion that Sung used his control of AMG "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights[.]" *Hibbs*, 430 S.W.3d at 306. *See Ahmad v. Dorman (In re Dorman)*, No. 12-4241-705, 2013 WL 3146854, at *1 (Bankr. E.D. Mo. June 19, 2013) ("It is … well-established that individuals—even individuals who are the sole shareholders of a closely held corporation and who are the only agents of that corporation—are separate legal entities from the corporation.") (footnote omitted).

If Sung merely participated in a breach of contract, then Baek cannot reach through the corporate veil to hold him liable for AMG's debt. Therefore, the court will must determine whether Sung's "fraudulent conduct" excepted the debt from discharge and imposed personal liability on the Defendant.

### B. Plaintiffs have not established by a preponderance of the evidence that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)

Plaintiffs must prove by a preponderance of the evidence that their debt should be excepted from Sung's discharge. *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). Exceptions to discharge are construed strictly against creditors and liberally in favor of debtors. *See Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992).

There is no dispute that AMG did not complete the work contemplated by the parties' contract. To prevail on their complaint, however, Plaintiffs must prove more than a breach of contract. The complaint seeks relief under 11 U.S.C. § 523(a)(2)(A):

(a)      A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b)
of this title does not discharge an individual debtor from any debt-- …

(2)      for money, property, services, or an extension, renewal, or
refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other
than a statement respecting the debtor's or an insider's
financial condition[.]

To except their claim from discharge based on false pretenses or a false representation,

Plaintiffs must prove by a preponderance of the evidence that: "(1) the debtor made a false

representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard

for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably

relied." *Ojeda v. Goldberg,* 599 F.3d 712, 717 (7th Cir. 2010) (citations omitted). *See Reeves v.*

*Davis*, 638 F.3d 549, 553 (7th Cir. 2011). "[A] failure to establish any one element is outcome

determinative." *Handler v. Moore* (*In re Moore*), 620 B.R. 617, 627 (Bankr. N.D. Ill. 2020).

1. **Defendant made a false representation**

The first question is whether Sung made a false representation to or used false pretenses

with Baek and Café Hanah.  A false representation is an express misrepresentation that is

demonstrated either by a spoken or written statement or by conduct.  *Id.* at 627-28.  "A debtor's

failure to disclose pertinent information may be a false representation where the circumstances

imply a specific set of facts and disclosure is necessary to correct what would otherwise be a

false impression." *Gasunas v. Yotis* (*In re Yotis*), 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016)

(quotation omitted).  False pretenses includes the situation where a debtor makes an implied

misrepresentation or acts in a manner intended to create a false impression.  *Moore*, 620 B.R. at

628.

Baek believed that Sung told him that the Village had approved the rough-in inspections,

and "rough-in inspection approval" was the contract term that triggered payment of 60% of the

12

contract price.  Sung testified that the Village inspector had approved the rough framing and plumbing inspections with exceptions, and that those issues would be easy to fix.  "My definition of approval," Sung testified, "is so that we can move on to next step."  He told Baek the inspections had been approved with conditions, showed Baek a copy of the inspection reports, and asked for payment.

The form used by the Village at the time had choices for "approved" and "disapproved" with an area for comments.  When asked at trial what a finding of disapproval means, Village inspector Klocko responded, "Boy, that's a vague question."  So, there does not appear to be a solid consensus about the meaning of "rough-in inspection approval," the term used as the condition for the 60% payment obligation in the parties' contract.

Regardless of this lack of consensus, there is no dispute that Sung never requested a rough mechanical inspection.  The rough-in inspection process includes inspections for framing, plumbing and mechanical.[2]  Even if Sung believed that the framing and plumbing inspections resulted in approvals because he was allowed to move forward with the work, he could not have accurately stated that "rough-in inspection approval" was complete without the mechanical inspection.  Therefore, Sung made a false representation to Baek.

**2. Sung did not make the representation with a reckless disregard for the truth**

Sung testified that he believed the various inspections resulted in his work being "approved with conditions."  He further stated that these deficiencies were easy to fix, and that he could continue the work.  The testimony adduced at trial supported his contention that AMG could move forward with the project.

---

[2] It may also include an electrical inspection, but questions about that inspection were withdrawn.

13

The burden at trial is on Plaintiffs to show by a preponderance of the evidence that Sung made a false representation with a reckless disregard for the truth.  Sung testified that he believed the minor deficiencies identified by the Village inspector did not preclude him from moving forward with the project.  He stated that "[m]y definition of approval is so that we can move on to next step."  Having had the opportunity to observe Sung on the stand and evaluate his demeanor, the court finds him to be a credible witness.

Moreover, Sung's testimony was corroborated generally by Village inspector Stephen Klocko.  He testified that if a rough framing inspection was not approved, he might instruct the contractor that construction could still continue, depending upon the extent of the required corrections.  "I would give permission to – say, drywall.  If there was an area that was completed, I would let them continue.  If there was an area that needed some work done, then I would not give approval for drywall in that area."

Exceptions to discharge are construed strictly against creditors, and liberally in favor of debtors.  In light of this policy, and based on the testimony Sung provided regarding his interpretation of the inspections, the court finds that Sung did not make the representation that the rough-in inspections were approved with reckless disregard for the truth.

### 3.  Sung did not make the representation with the intent to deceive Plaintiffs

Sung testified that he never called for the rough mechanical inspection because he "needed more funds to complete that work."  Those are the funds that, under the contract, would not have become due until after the rough mechanical inspection was approved.  This testimony weighs in favor of a finding that Sung intended to deceive Baek so that he could get the money he needed to complete the project.

Other evidence adduced at trial, however, suggests that Sung was committed to completing this construction project and did not intend to deceive Baek when he told him that the

14

rough-in inspections had been approved.  Shortly before the parties signed the contract, for example, Sung learned about a TIF grant that was available for development in downtown Skokie.  He informed Baek, they signed a contract for Sung to prepare the necessary documents, and Sung worked with a Village employee.  A TIF grant was approved in October 2012, and Baek received $98,000.  Sung was invested in the success of this project.

He was also invested in staying in the good graces of the Village inspectors.  The same year that Sung withdrew from the Café Hanah project, he completed a gut rehab of another building in the Village.   This piece of evidence provides two bases to conclude that Sung did not intend to deceive Baek.  First, it would not have been rational to jeopardize his relationship with the Village inspectors at the same time he continued to do other construction work in the Village.  Second, evidence of building other projects in an acceptable manner tends to show that there was no pattern of false representations by which intent to defraud Plaintiffs can be inferred.  *See Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1018 (Bankr. N.D. Ill. 1996).

In considering all of the evidence, and keeping in mind that exceptions to discharge are construed narrowly in favor of debtors, the court finds that Plaintiffs have not met their burden of proof that Sung intended to deceive them.

### 4.  Baek and Café Hanah did not justifiably rely on Sung's representations about the inspections

Although Plaintiffs have not met their burden of proving that Sung made a false representation with reckless disregard for the truth, or that he intended to deceive them, the court will still consider the final factor – justifiable reliance.  Whether a creditor justifiably relied on a defendant's representations is based on the facts and circumstances of each case and of the particular plaintiff.  *See Field v. Mans*, 516 U.S. 59, 71-72 (1995); *Ojeda*, 599 F.3d at 717.  The creditor is "required to use his senses, and cannot recover if he blindly relies upon a

15

misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field*, 516 U.S. at 71 (quotation omitted). *See Ojeda*, 599 F.3d at 717.

Baek testified that he visited the project frequently. Although he could not tell from a visit whether the Village had approved the rough inspections, it would have been simple enough to request a copy of the inspection report before handing over $61,500. In fact, Sung testified that he shared the inspection reports with Baek.[3]

The court notes that Baek testified through an interpreter. There may have been miscommunications or misunderstandings due to language differences. But even if there were no such misunderstandings, Baek's failure to use "his opportunity to make a cursory examination or investigation" by requesting copies of the inspection reports, or reading the copies shared with him, means that he could not have justifiably relied on conversations he had with Sung in believing that the inspections resulted in approval.

### C. Plaintiffs have not met their burden to pierce the corporate veil

There is no dispute that AMG did not finish the construction project, and therefore it breached its contract with Café Hanah. But a breach of contract unaccompanied by tortious conduct is not sufficient to find that the resulting debt is nondischargeable. *See, e.g., Perlman v. Zell*, 185 F.3d 850, 852 (7th Cir. 1999) ("Breach of contract is not fraud; only making a promise with the intent not to keep it deserves that epithet.").

---

[3] Defendant argued in his posttrial brief that because the complaint alleged Baek did not learn of the false representations until he took over as general contractor, he could not have relied on those statements. The court read that allegation, as well as the testimony adduced in court, to mean that Baek did not know Sung's representations were false at the time he heard them, not that he did not know of the representations at all. When a plaintiff alleges that he incurred a debt due to a defendant's false representation, common sense dictates that he only learned later that it was false.

Piercing the corporate veil under Missouri law is permitted only in "narrow circumstances." *Hibbs*, 430 S.W. 3d at 306 (quotation omitted).  Dominance and control is only one factor.  In order to disregard the corporate structure and impose individual liability, "evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud." *Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp.*, 885 S.W.2d 771, 773–74 (Mo. Ct. App. 1994).  To disregard the corporate entity, however, "is the exception rather than the rule, and, ordinarily, a corporation will be regarded as a separate legal entity even though there be but a single stockholder." *Love v. Ben Hicks Chevrolet, Inc.*, 655 S.W.2d 574, 576 (Mo. Ct. App. 1983).

Here, AMG functioned as a viable corporation, completing other projects, including several involving the same municipality.  AMG informed the Village that it was withdrawing as contractor on the Café Hanah project and, despite its disagreement with Baek, encouraged its subcontractors to continue working with Baek if they were paid.  AMG was not a subterfuge.  Plaintiffs' complaint relies only upon the alleged misrepresentations.  Plaintiffs did not meet their burden of proof; AMG's corporate identity will not be disregarded in order to hold Sung responsible for AMG's debt to Plaintiffs.

## IV.    CONCLUSION

Plaintiffs sought a finding that the debt owed to them by AMG cannot be discharged in Sung's bankruptcy case.  In order to prevail, they had to prove by a preponderance of the evidence that AMG's corporate structure should be disregarded, thereby imposing personal liability upon Sung, and that Sung made a representation or omission which he knew was false or made with reckless disregard for the truth, that he made it with the intent to deceive, and that Plaintiffs justifiably relied on that representation.

Having heard the testimony of the witnesses, reviewed the admitted exhibits, and read the papers and briefs submitted by the parties, and keeping in mind that exceptions to discharge are construed narrowly in favor of the bankruptcy debtor, the court finds that Plaintiffs have not met their burdens of proof.  Judgment will be entered in favor of Defendant.


Date:   December 4, 2023

_____
DAVID D. CLEARY
United States Bankruptcy Judge